# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FRONTLINE TECHNOLOGIES PARENT, LLC, and FRONTLINE TECHNOLOGIES GROUP, LLC | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0546-LWW |
| BRIAN MURPHY and ANNAMARY HOLBROOK, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 26, 2023
Date Decided: August 23, 2023

Laurence C. Cronin & Kelly A. Green, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; William J. Leahy & Tanner McCarron, LITTLER MENDELSON, P.C., Philadelphia, Pennsylvania; *Counsel for Plaintiffs Frontline Technologies Parent, LLC and Frontline Technologies Group, LLC*

Richard P. Rollo, Travis S. Hunter, Tyler E. Cragg & Griffin A. Schoenbaum, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendants Brian Murphy and Annamary Holbrook*

**WILL, Vice Chancellor**

This case presents a textbook example of why parties should ensure their contracts say what they mean and mean what they say. A holding company entered into equity agreements with two (former) employees, including non-compete provisions barring the employees from working for a competitor of the holding company. What it intended, though, was to prevent the employees from working for a competitor of its operating subsidiary. The equity agreements say nothing of the sort.

The employees now work for the operating subsidiary's competitor. They are being sued for breaching the restrictive covenants in their equity agreements. But the plain terms of the agreements do not bar their continued employment. The plaintiffs' breach of contract claims necessarily fail.

Perhaps acknowledging that it struck a bad deal, the holding company also seeks equitable rescission. Its agreement to unambiguous restrictive covenants does not, however, constitute a mutual mistake warranting that relief.

The defendants' motion to dismiss is granted.

I.      **FACTUAL BACKGROUND**

The following background is drawn from the plaintiffs' Verified Amended Complaint (the "Complaint") and the documents it incorporates by reference.[1]

---

[1] Verified Amended Compl. (Dkt. 25) ("Compl."); *see In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006)).

## A. Frontline's Business

Plaintiff Frontline Technologies Group, LLC ("Frontline") is a Delaware limited liability company that provides administration software for educators across the United States.[2] It has three product lines: human capital management, business operations management, and student management.[3] Frontline is a subsidiary of plaintiff Frontline Technologies Parent, LLC ("Parent"), a Delaware limited liability company.[4] During the events relevant to this action, Parent was owned by private equity firm Thoma Bravo.[5]

## B. The Equity Agreements

On December 4, 2017, defendant Annamary Holbrook was hired by Frontline as Director, Solutions Consulting.[6] She supervised sixteen employees who provided technical software support to buyers.[7] Certain employees managed by Ms. Holbrook supported all of Frontline's product lines.[8]

---

[2] Compl. ¶¶ 3, 8.

[3] *Id.* ¶ 9.

[4] *Id.* ¶ 2, Preamble.

[5] Thoma Bravo sold the company to Roper Technologies, Inc. for $3.725 billion in 2022. *See* Thoma Bravo, *Thoma Bravo Enters into Agreement to Sell Frontline Education to Roper Technologies* (Aug. 30, 2022) (https://www.thomabravo.com/press-releases/thoma-bravo-enters-into-agreement-to-sell-frontline-education-to-roper-technologies).

[6] Compl. ¶ 22.

[7] *Id.* ¶ 23.

[8] *Id.* ¶ 24.

On December 11, defendant Brian Murphy began working for Frontline as Vice President, Sales.[9] He supervised employees who oversaw regional sales teams selling Frontline's products nationwide.[10]

In consideration for equity units in Parent, Holbrook and Murphy each entered into Incentive Equity Grant Agreements (the "Equity Agreements").[11] Murphy signed Equity Agreements with Parent and several Thoma Bravo fund entities on May 2, 2018 and February 17, 2022.[12] Through the Equity Agreements, he received units worth $1.24 million.[13] Holbrook signed four Equity Agreements with Parent and Thoma Bravo fund entities on May 2, 2018, February 25, 2020, February 26, 2021, and February 21, 2022.[14] In exchange, she received units worth $773,000.[15] Frontline was not a party to the Equity Agreements.[16]

In Section 7(a) of the Equity Agreements, Murphy and Holbrook acknowledged that they had access to "confidential and/or proprietary information

---

[9] *Id.* ¶ 18.

[10] *Id.* ¶¶ 19-20.

[11] *Id.* ¶ 25.

[12] *Id.* Ex. A ("Murphy Equity Agreements").

[13] *Id.* ¶ 26.

[14] *Id.* Ex. B ("Holbrook Equity Agreements" and, with the Murphy Equity Agreements, the "Equity Agreements"). The Holbrook Equity Agreements and Murphy Equity Agreements are the same in all relevant respects.

[15] *Id.* ¶ 27.

[16] Equity Agreements at Preamble.

of the Company and/or of its Affiliates."[17]  The Equity Agreements also contained

non-competition provisions in Section 7(c)(i).[18]

### C.      The Resignations and LINQ

On April 4, 2023, Holbrook told her then-manager that she was resigning from

Frontline.[19]  At the time, she was Frontline's Vice President, Solutions Consulting.[20]

Murphy gave notice of his departure from Frontline on April 9.[21]  Both stated that

they had not identified their next job opportunities.[22]  Murphy and Holbrook ended

their employments with Frontline on April 21.[23]

Holbrook and Murphy soon began employment with LINQ, Inc.[24]  LINQ

develops and sells school administration software.[25]  According to the Complaint,

LINQ is "Frontline's competitor."[26]

---

[17] *Id.* § 7(a).

[18] *Id.* § 7(c)(i); *see infra* notes 49-51 and accompanying text.

[19] Compl. ¶ 42.

[20] *Id.* ¶ 22.

[21] *Id.* ¶ 46.

[22] *Id.* ¶¶ 43, 47.

[23] *Id.* ¶¶ 45, 48.

[24] *Id.* ¶ 52.

[25] *Id.* ¶ 53.

[26] *Id.* ¶¶ 1, 64-68.

## D.     This Litigation

On May 19, the plaintiffs filed a Verified Complaint in this court.[27]  They advanced a breach of contract claim against each of the defendants for violating the restrictive covenants in the Equity Agreements.  The plaintiffs also moved for expedited proceedings and a temporary restraining order to prevent the defendants from working at LINQ.[28]

On June 2, I denied the motion for a temporary restraining order.[29] I granted the motion to expedite insofar as a hearing on the plaintiffs' motion for a preliminary injunction was set for the fall of 2023.[30]  I also permitted expedited briefing on the defendants' motion to dismiss in advance of the preliminary injunction hearing.[31]

On June 12, the plaintiffs filed a Verified Amended Complaint (previously defined as the "Complaint").[32]  The Complaint continued to assert breach of contract claims in Counts I and II, and added claims seeking equitable rescission of the Equity Agreements in Counts III and IV.[33]

---

[27] Dkt. 1.

[28] *Id.*; *see* Dkts. 7, 15.

[29] Dkts. 19, 30.

[30] Dkt. 20.

[31] Dkts. 19, 30.

[32] Dkt. 25.

[33] *Id.*

On June 20, the defendants filed a motion to dismiss the Complaint with an opening brief in support.[34] The plaintiffs filed an answering brief in opposition to the motion to dismiss on June 26.[35] On June 30, the defendants filed a reply brief in further support of the motion.[36] I heard oral argument on July 26.[37] A preliminary injunction hearing is set for October 2. Discovery is stayed pending resolution of the motion to dismiss.[38]

## II.    LEGAL ANALYSIS

The defendants seek dismissal of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The standard that governs their motion is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[39]

---

[34] Defs.' Opening Br. in Supp. of Defs.' Mot. to Dismiss Pls.' Verified Am. Compl. (Dkt. 32) ("Defs.' Opening Br.").

[35] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 34) ("Pls.' Answering Br.").

[36] Reply Br. in Further Supp. of Defs.' Mot. to Dismiss Pls.' Verified Am. Compl. (Dkt. 36) ("Defs.' Reply Br.").

[37] Dkts. 39, 40.

[38] Dkt. 26.

[39] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

I "must draw reasonable inferences in favor" of the plaintiffs but need not "accept every strained interpretation of the [plaintiffs'] allegations."[40]

The defendants raise several grounds for dismissal, including that the plaintiffs failed to plead breaches of the Equity Agreements and that the non-compete provisions are unenforceable. Because I conclude that the plaintiffs have not stated viable breach of contract claims, I do not reach the defendants' other arguments. As to equitable rescission, that remedy is unavailable to the plaintiffs given the absence of any alleged mutual mistake of fact.

## A. Breach of Contract

In Counts I and II of the Complaint, the plaintiffs claim that each defendant breached the non-competition provisions of their Equity Agreements by working for LINQ.[41] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[42] The plaintiffs have not satisfied the second element.

---

[40] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[41] Compl. ¶¶ 72-89.

[42] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

7

As an initial matter, the defendants argue that the non-compete provisions never applied to them.[43] The Equity Agreements define the "Non-Competition Period" as that spanning the "Employee's employment by or service to [Parent] and for a period of one (1) year thereafter."[44] But the defendants were employed by Frontline—not Parent.[45] The Equity Agreements make no mention of Frontline.[46]

Even if the defendants provided "service" to Parent through their work for Frontline, the claims still fail.[47] The non-compete provisions are expressly tailored to the "business" or "business line" of Parent—not Frontline.[48] Specifically, Murphy

---

[43] *See* Defs.' Opening Br. 11-12; Defs.' Reply Br. 3-4.

[44] Equity Agreements § 7(c)(i).

[45] Compl. ¶ 1.

[46] The Equity Agreements only address third-party beneficiaries affiliated with a Thoma Bravo entity (that is not Frontline). Equity Agreements § 10(m) ("Third Party Beneficiaries. Certain provisions of this Agreement are entered into for the benefit of and shall be enforceable by TB [various Thoma Bravo fund entities] as provided herein." (emphasis in original)). This implies that Frontline is not a third-party beneficiary to the Equity Agreements. *See Fortis Advisors LLC v. Meds. Co., & Melinta Therapeutics, Inc.*, 2019 WL 7290945, at *4 (Del. Ch. Dec. 18, 2019) ("The negative implication created by Section 13.7's express inclusion of Financing Sources as third-party beneficiaries is that other third parties are not intended beneficiaries."). Thus, it is not apparent that Frontline even has standing to sue.

[47] *See* Pl.'s Answering Br. 12 ("Because Frontline is an affiliate and subsidiary of Parent, Defendants performed services to Parent by working for Frontline.").

[48] Equity Agreements § 7(c)(i); *see generally Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (explaining that "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

and Holbrook agreed not to "directly or indirectly participate in any activity" that would "qualify as Competition in the Territory."[49] "Competition" means:

> to directly or indirectly own any interest in, manage, operate, control, invest or acquire an interest in, participate in, consult with, render services to or for, operate or in any manner engage in, any Person, business or enterprise (including any division, group or franchise of a larger organization), whether as a proprietor, owner, member, partner, stockholder, director, officer, employee, consultant, joint venturer, investor, licensor, sales representative or other participant, that conducts, participates in or constitutes a business or business line that the Company is conducting or that the Company conducted during the one (1) year period immediately preceding the date that Employee is no longer employed by the Company or any Company Subsidiary or Affiliate.[50]

The "Company" is defined as "Parent."[51]

The plaintiffs describe Frontline's business in their Complaint.[52] They also discuss LINQ's business and aver that LINQ is Frontline's competitor.[53] They do not, however, describe Parent's business or allege that LINQ competes with Parent.

---

[49] Equity Agreements § 7(c)(i).

[50] Equity Agreements § 7(c)(i). "Subsidiary" is defined as "any corporation, partnership, limited liability company or similar entity of which the Company owns securities having a majority of the ordinary voting power in electing the board of directors directly or through one or more subsidiaries." *Id.* § 8. "Territory" is defined as "all of the United States of America, Australia and Canada, together with all of each other country in which the Company provides sale or services during Employee's employment or engagement or, upon termination of Employee's employment or engagement, provided sales or services at any time during the one (1) year period prior to the termination of Employee's employment or engagement." *Id.* § 7(c)(ii).

[51] Equity Agreements at Preamble.

[52] *See* Compl. ¶¶ 8-17.

[53] *E.g.*, *id.* ¶¶ 1, 64-67.

In fact, the only allegations about Parent in the Complaint concern its status as a party to the Equity Agreements and its issuance of equity to the defendants.[54]  As a result, the Equity Agreements do not prevent the defendants from working at LINQ.

The plaintiffs attempt to save their deficient claims by pointing to the defendants' acknowledgements in Section 7(a) of the Equity Agreements about access to confidential information of Parent's "Affiliates."[55]  These provisions do not say that the defendants would have access to *Frontline's* confidential information.[56]  In any event, there are no allegations in the Complaint stating that Frontline's confidential information is used in the business or business line of

---

[54] *Id.* ¶¶ 1-2, 73, 82, 91-92, 94-95, 102-03, 105-06.

[55] Pl.'s Answering Br. 18; *see* Equity Agreements § 7(a) ("<u>Confidential Information</u>. Employee recognizes and acknowledges that by reason of his or her employment with or engagement by the Company or its Affiliates, he or she will have access to confidential and/or proprietary information of the Company and/or any of its Affiliates . . . . Employee hereby assigns to the Company all rights he or she may have or acquire in such Proprietary Information and recognizes and agrees that all Proprietary Information shall be the sole property of the Company and its assigns." (emphasis in original)).  "Affiliates" is defined as "any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person . . . 'control' . . . shall mean possession, directly or indirectly, or power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise)." *Id.* § 8.

[56] The Complaint does not state that the defendants had access to Frontline's confidential information by agreeing to Section 7(a).

10

Parent.[57]   This argument therefore cannot support a claim for breach of the non-compete provisions, which prohibit competition with Parent's "business or business line."

If the plaintiffs wanted the non-compete provisions to apply to Frontline's business or business line, they could have defined Competition to include "a business or business line that the Company [*or its Affiliates*] is conducting."[58]   They did not.   Although the term Affiliates is mentioned elsewhere in the Equity Agreements—and even in the non-compete provisions—it is excluded from the definition of Competition.[59]   The plaintiffs must now live with the restrictive covenants they agreed to.[60]

---

[57] A hypothetical illustrates the point.  Company A is a fast-food restaurant owned by Company B, a private equity firm.  Company A's business is making fried chicken using a special blend of herbs and spices.  Company B's business is investing in various companies.  By the plaintiffs' logic, Section 7(a) would mean that Company B is engaged in the business of making fried chicken.  But having access to the special blend of herbs and spices does not mean that Company B is a fried chicken maker.  *See* Def.'s Reply 11-12.

[58] Equity Agreements § 7(c)(i) (bracketed emphasized text added).

[59] *See id.* § 7(c)(i) (addressing "the date that Employee is no longer employed by the Company or any Company Subsidiary or Affiliate"); *cf. Hawkins v. Daniel*, 273 A.3d 792, 832 (Del. Ch. 2022) ("If the drafters had intended to include transferees in the Affiliate Definition, they easily could have done so.  The fact that the term appears in the Transfer Restriction, two sentences later, indicates that the drafters knew how to refer to transferees and chose not to include the term in the Affiliate Definition."), *aff'd*, 289 A.3d 631 (Del. 2023).

[60] *See generally GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.").

## B. Equitable Rescission

Counts III and IV of the Complaint seek equitable rescission of the Equity Agreements based upon a mutual mistake.[61] The plaintiffs' theory is that when entering into the Equity Agreements, they believed the defendants would be restricted from competing with Frontline.[62] The problem for the plaintiffs is that they agreed to a contract stating otherwise.

Mutual mistake requires a showing "that the parties came to a specific prior understanding that differed materially from the written agreement" or that the counterparty "knew of . . . [the] mistake and remained silent" to capitalize on it.[63] Though a party may seek rescission based on a mutual mistake, the mistake "must stem from a mistake of fact that existed at the time of contracting."[64] The plaintiffs do not, however, contend that a mistake of fact existed when they entered into the Equity Agreements or that the defendants took advantage of a one-sided mistake. Instead, they maintain that they were mistaken only if I conclude that the restrictive covenants are unenforceable.[65]

---

[61] Compl. ¶¶ 90-111.

[62] *Id.* ¶¶ 92, 103; Pls.' Answering Br. 28; Tr. of Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 40) ("Hr'g Tr.") 28-29 (plaintiffs' counsel clarifying their theory).

[63] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152 (Del. 2002).

[64] *Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *17 (Del. Ch. Dec. 13, 2021).

[65] *See* Comp. ¶¶ 92, 103; Pl.'s Answering Br. 28-29.

But this conditional argument based on the outcome of litigation is not a mistake of fact. Nor is poor contract drafting.[66] Rescission simply cannot save a party from its agreement to unambiguous contract provisions that later prove disadvantageous.[67]

## III.   CONCLUSION

For the reasons explained above, the defendants' motion to dismiss is granted. The Complaint is dismissed in its entirety.

---

[66] *See Fed. Land Bank of Baltimore v. Pusey*, 1986 WL 9041, at *3 (Del. Super. July 21, 1986) ("A mistake of fact exists where a person understands the facts to be other than they actually are, as where some fact which really exists is unknown, or some fact is supposed to exist which really does not or did not exist.").

[67] *Cf. Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *5 (Del. Ch. Mar. 29, 2011) ("Fletcher, a sophisticated contracting party, could have bargained for the right it now in effect claims . . . . It did not, and this court is not empowered to rewrite an unambiguous contract in order to have it meet Fletcher's current business needs."). Furthermore, the parties agreed to a severability clause in the Equity Agreements. Equity Agreements § 10(a) (providing that "if any provision of [the] Agreement is held to be invalid, illegal, or unenforceable . . . [the] Agreement shall be reformed, construed and enforced . . . as if such invalid illegal or unenforceable provision had never been contained therein").

13